UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL A. HEARTSMAN,

          Petitioner,

    v.

ERIC ARNOLD, et al.,

          Respondents.

Case No. 16-cv-06098-VC  (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; ISSUING CERTIFICATE OF APPEALABILITY ON ONE CLAIM**

Dkt. No. 11

       Michael A. Heartsman filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his state criminal conviction.  In his traverse, Heartsman moves for an evidentiary hearing.  The motion for an evidentiary hearing and the petition are denied.

## PROCEDURAL BACKGROUND

       On November 29, 2011, an Alameda County jury found Heartsman guilty of: (1) the murder of Ditiyan Franklin; (2) the attempted murder of Lionel Harris; and (3) possession of a firearm by a felon.  The jury also found Heartsman had used a firearm in the commission of the murder and attempted murder and he had two prior felony convictions.  The court sentenced Heartsman to a prison term of 50 years to life.

       Heartsman appealed and, in a written opinion, the Court of Appeal affirmed the convictions.  *See People v. Heartsman*, 2015 WL 2400736 (Cal. Ct. App. May 20, 2015) (unpublished).  On June 24, 2015, Heartsman filed a petition for review in the California Supreme Court, which was summarily denied on August 19, 2015.  Exs. 11, 12.

       On October 21, 2016, Heartsman filed a timely petition with five exhausted claims, which the Court now reviews.

## BACKGROUND

**I. Crime and Investigation**

At about 2:30 p.m. on May 25, 2011, a police dispatcher reported a shooting at the intersection of Ritchie and Olive Streets.  2 Reporter's Transcript ("RT") 339-40.  When Oakland Police Officer James Henry arrived at that location, he saw 17-year-old Ditiyan Franklin lying motionless in the driveway of 2421 Ritchie Street.  2 RT 340-43.  Many people were standing near the driveway and Henry ordered them to clear the area.  2 RT 341-44.

Oakland Police Officer Bruce Christensen arrived a few minutes later.  2 RT 326, 332. Christensen moved a bicycle from the middle of Ritchie Street to the curb.  2 RT 327.  Two African-American men, later identified as Lionel Harris and his brother, asked Christensen if they could have the bike.  2 RT 332-333.  This interaction was recorded by a device on Christensen's shirt and the recording was later played for the jury at Heartsman's trial.  2 RT 412-13.

Later that evening, Oakland Police Sergeant Steven Nowak spoke to the resident of 2421 Ritchie Street.  4 RT 669, 676-79.  The resident said the shooter was a "heavyset black male" who had been riding in a white sedan, possibly a Japanese car, like a Toyota.  4 RT 669, 676, 683, 723.  Investigators discovered seven expended shell casings and five bullet slugs at the crime scene.  1 RT 235-37.  The locations of the casings and slugs suggested the shooter began firing at Franklin in the street near the house, Franklin ran toward the house with the shooter following him until Franklin collapsed and died in the driveway.  1 RT 228-34; 237-39; 242-43; 4 RT 677-82.

Over the next few days, Nowak talked to roughly a dozen witnesses to the shooting.  4 RT 686.  Many of them wanted to remain anonymous because they were fearful of being labeled a snitch.  4 RT 686-89.  Many of them agreed on the following: (1) the shooter was a young African-American man nicknamed "Nut Case Mike" who worked at an Oakland youth center called "Youth Uprising," 4 RT 686; 716-17; (2) the shooter was in a white Japanese sedan, possibly a Toyota or Honda; and (3) Franklin had been with another young man called "L. Dose" or "L. Dolge" at the time of the shooting.  4 RT 689-90; 694-95.  None of these anonymous

witnesses testified at the trial, but Nowak, in his testimony, summarized what he learned from them.

Eventually Nowak learned Heartsman was a heavyset young African-American who worked at Youth Uprising and was known as "Nut Case Mike." 4 RT 714, 717.

On July 3, 2011, Nowak learned that "L. Dose" was Lionel Harris. 4 RT 689, 695-96. In his interview with the police, Harris described how a man he knew as "Fat Mike" or "Nut Case Mike" jumped out of a white Honda and fired several gunshots at him and Franklin. 4 RT 683-84; 698-702. Harris' description of Franklin's flight from the shooter was consistent with the locations of the shell casings and bullet slugs. 4 RT 705-07. Harris also said when he looked at Franklin immediately after the shooting, he saw Franklin's mouth and eyes were open. 4 RT 705. These were facts only a person at the scene of the crime would know and, thus, Nowak found his description to be credible. 4 RT 705. Nowak also knew about the videotape of Harris asking a police officer, immediately after the shooting, if he could take the bike away from the crime scene. 2 RT 412-13; 2 RT 573-75; 579; 585. Toward the end of Harris' interview, Nowak showed him three six-pack photo lineups. 4 RT 707-11. One of the lineups included a recent photo of Heartsman and Harris immediately identified Heartsman as "Mike," the shooter.

Nowak arrested Heartsman on July 6, 2011. 4 RT 714. Heartsman had several tattoos, including one that said, "8600, Funk or Die." 4 RT 714.

## II. Trial

### A. Prosecution Case

Harris testified to what he witnessed at the shooting. The prosecutor played for him a videotape of Heartsman singing a rap song, "Hella Shit." 2 RT 420. In one passage, Heartsman sang, "Somebody disrespecting, I'm gonna bounce out and get it, get it." 1 Supplemental Court Transcript ("Supp. CT") 529 (Ex. 2, Vol 3 at 529). Harris said this meant "You're gonna jump out of a car and you're gonna kill the person." 2 RT 426. Heartsman also sang, "yeah I'm the veteran we better than the rest of them knocking them all down til we the last one standing nigga." 1 Supp. CT 529. Harris said "knocking them all down" meant killing people. 2 RT 427.

Harris testified that he and Franklin were members of the "Taliban Mafia" street gang and he believed Heartsman was a member of the "Case Boys" gang, also known as the "Nut Case Boys." 2 RT 352, 371-76.

Evidence was presented that a number of calls had been made and received on Heartsman's cell phone the day of the shooting. One of the calls was received at 2:22 p.m., the approximate time of the shooting and it was transmitted from the cell phone tower closest to the crime scene. 3 RT 531-32; 4 RT 652-65.

Oakland Police Officer Chris Marie, an expert on Oakland street gangs, described the hostility between the Taliban Mafia and the Case Boys. 3 RT 595-605. Marie testified there were a series of shootings between the two gangs, including the shooting of Harris by a Nut Case Boy on September 5, 2010. 2 RT 374-77; 3 RT 601-02. Marie suspected the May 2011 attack on Harris and Franklin was related to the dispute between the two gangs. 3 RT 595, 599, 601-02. Marie confirmed Harris's testimony about the meaning of the lyrics in the rap video, "Hella Shit." 3 RT 610-14. Marie also testified Heartsman's tattoo, "8600, Funk or Die," reflected gang membership or affiliation. 3 RT 621-22.

**B. Defense Case**

Heartsman did not testify, but the defense called several alibi witnesses and argued that Heartsman was at Youth Uprising when the shooting took place.

Some of the defense witnesses testified they recognized Heartsman in the video from Youth Uprising surveillance cameras at the approximate time of the shooting. Youth Uprising Manager Vincent Burton, Youth Uprising Work Manager Olugbala Akintude, Heartsman's friends, Isaac Alford and Jamal Robbson, and Heartsman's brother, Marlon Stubblefield, identified Heartsman in footage taken between 2:17 and 2:51 p.m. Other witnesses identified Heartsman in footage recorded between 3:07 and 3:23 p.m. The witnesses identified Heartsman by his build, gait and gray and black letterman's jacket.

Akintude testified Heartsman had worked at Youth Uprising during his 3:30 to 7:30 p.m. shift as a janitor. 5 RT 886-87, 901, 918, 932. Alford, who lived in an apartment across the

street from Youth Uprising, testified Heartsman had been at Alford's apartment on the afternoon of May 25, 2011. Alford testified Heartsman was wearing blue jeans, a black T-shirt and his letterman's jacket. 5 RT 934. He had a mobile phone photograph of Heartsman wearing the letterman's jacket. 5 RT 934-36.

Stubblefield testified he was at Alford's house around 1:10 p.m. on May 25. When he heard gunshots about an hour later, he was with Heartsman, Alford and Robbson. 5 RT 988-89. Robbson testified he went over to Alford's house at about 2:00 p.m. and saw Heartsman there. 6 RT 1003, 1016, 1018-19, 1024. As they sat and talked, they heard gunshots. 6 RT 1020.

On cross-examination, the prosecutor impeached the alibi witnesses in several ways. Youth Uprising Manager Burton acknowledged he had testified at the preliminary hearing that he saw Heartsman in the Youth Uprising video only after 3:08 p.m. 4 RT 773-78; 5 RT 865. Burton said he had not reviewed the earlier portions of the videotape until a few weeks before the trial but acknowledged he had not contacted the police after discovering the exculpatory evidence. 5 RT 866-67. Burton acknowledged that people cannot enter the premises of Youth Uprising without swiping an electronic identity card through a card reader and there was no record of Heartsman using his card on the day of the murder. 5 RT 852-55; 916-18.

The other witnesses also testified that they discovered the exculpatory Youth Uprising video footage several weeks before the trial, but did not contact the police or prosecutor about it. In cross-examining Akintude, the prosecutor played selected passages from calls Heartsman made from jail to Akintude, which included the following dialogue that could be understood as reflecting a plan to present a false alibi placing Heartsman at Youth Uprising at the time of the murder:

| | |
|---|---|
| Akintunde: | I don't want you to be on the phone and slip up and say something that might, you know. |
| Heartsman: | Yeah, I already know. |
| Akintunde: | All this shit is being recorded. I don't want them, you know what I'm saying. They come around. They be calling me in to ask me questions and shit. They already called me. |
| Heartsman: | I gave them the number. Feel me. . . .What they ask you when they called |

you?

Akintunde:   Shit. Just uh.  What your work schedule was and when you be up there.

Heartsman:   And what did you say?  That I be up there all day?

Akintunde:   You be up there kicking it.  You only come to early, you don't actually be
             there.  But then you [unintelligible] asking like when you, uh, how do I
             know that you're there when you're there.  I'm like because we all
             ride together you know what I'm saying.  We meet up.  We do what
             we do.  Like we don't be here.  When we meet at the center we be
             at the center.  But other than that we in the van.  We out.  Basically trying
             to see if you could sneak off on me when you at work.

Heartsman:   Yeah.

II CT Supp. 725; ECF No. 14-8 at 109, Transcript of July 8, 2011 Telephone Call

A second call, later on July 8, contained the following colloquy:

Akintunde:   I want you to know this was May before we even had no jobs.

Heartsman:   I know. I know. We was doing landscaping too, though, right?

Akintunde:   Yeah, a bit.

Heartsman:   That's what I'm saying, we was probably gone.

Akintunde:   Hey.

Heartsman:   Hey, can you look up my time sheet and see what time we started
             working?

Akintunde:   Hey.  Hey.  I already dealt with all that.

Heartsman:   What.  What that say?

Akintunde:   That's what I'm.  That's what I'm telling you.

Heartsman:   Damn blood.

Akintunde:   We gotta work it from here.

Heartsman:   Alright blood.

Akintunde:   Because I did all that.  I did all that yesterday, two days ago.  You
             understand what I'm saying?

Heartsman:   Yeah.  But what do I do now blood?

Akintunde:   You're supposed to be cool.  Make sure you deal with your public
             defender and don't say shit.  That's all you gotta do.

| Heartsman: | If they ask me what happened I'm gonna be like I was at work. That's the only thing I got is that I was at work. |
|---|---|
| Akintunde: | All you gotta say is you don't know. |
| Heartsman: | Huh? |
| Akintunde: | You don't have to be at work to say you don't know. Just. You don't fucking know, Mike. You wasn't, if you wasn't there, then you don't know. |
| Heartsman: | Alright. |
| Akintunde: | You know what I'm saying [unintelligible]. All they know is some [unintelligible] prove [unintelligible] where they were. |
| Heartsman: | Yeah. Alright. |
| Akintunde: | As long as you don't know, you don't know. You understand? |
| Heartsman: | Yeah. |

II CT Supp. 727-28; ECF No. 14-8 at 111-12, Transcript of July 8, 2011 Telephone Call

In his opening statement and closing argument, defense counsel argued the evidence showed a young man named Rondell Hampton was the shooter. Hampton looked like Heartsman and had driven to Castlemont High School in a white Chevy Corsica on the morning of May 25, 2011. 1 RT 194-203; 6 RT 1178-79.

**C. Prosecution Rebuttal**

Gang expert Marie testified about a second rap video which was played for the jury. 6 RT 1026-27. Marie said several people in the video were gang members who had ties to the Nut Case Boys gang. 6 RT 1026-29. One scene showed a young man getting out of a car with gun in hand while the singer sang, "I'm gonna bounce out." 6 RT 1030.

The video of the man the alibi witnesses had identified as Heartsman showed him talking on a cell phone at 2:42 and 2:56 p.m., but Heartsman's phone records did not show any calls made or received at those times. 6 RT 1055-56. Phone records showed Heartsman's phone had received a call at 3:00 p.m. lasting more than 14 minutes but, during this time, the man in the video had his hand at his side. 6 RT 1059-62.

Nowak testified that when he arrested Heartsman at 11:11 a.m. on July 6, 2011 he did not tell Heartsman or his family the reason for the arrest. 6 RT 1044-46. Heartsman was taken to the police station, but did not make any phone calls. 6 RT 1047. Around 12:15 p.m., Nowak received a call from Daniel Mora, a Youth Uprising employee, who said he could provide an alibi for Heartsman because Youth Uprising video footage showed Heartsman was at Youth Uprising at the time of Franklin's shooting. 6 RT 1051.

## STANDARD OF REVIEW

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This is a highly deferential standard for evaluating state court rulings: "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). In this case, the California Court of Appeal is the highest court to

issue a reasoned decision on Heartsman's claims.

## DISCUSSION

### I. Admission of Rap Videos

Heartsman contends the trial court erred by admitting two rap videos into evidence.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). To show that admission of certain evidence rendered the trial fundamentally unfair in violation of due process, a habeas petitioner bears a "heavy burden" of demonstrating that there were "no permissible inferences" the jury could draw from the challenged evidence. *Boyde v. Brown*, 404 F.3d 1159, 1162 (9th Cir. 2005); *see also Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process).

Citing *State v. Skinner*, 218 N.J. 496 (2014), Heartsman argues the rap videos should have been excluded because they were more prejudicial than probative. However, state law is not applicable in a federal habeas proceeding. To the extent Heartsman argues his due process rights were violated by the admission of the videos, the claim must be denied because no United States Supreme Court authority holds admission of overtly prejudicial evidence constitutes a due process violation. Further, the videos were admissible under *Boyle* and *Jamal*, because they corroborated Harris' testimony that Heartsman was a member of a gang and, thus, had a motive to retaliate against Harris and Franklin, who were members of a rival gang. Although there is a good argument based on the California Rules of Evidence that the trial judge should not have allowed admission of these videos (and a great argument that the trial judge should never have allowed Harris to interpret the videos for the jury), it does not follow that there was no

permissible inference to be drawn from them.

In any event, the admission of the videos was not prejudicial under *Brecht* because the prosecution introduced substantial evidence, apart from the videos, of Heartsman's membership in a street gang: Harris testified that he believed Heartsman was a member of the "Case Boys" or "Nut Case Boys" street gang and that he and Franklin were members of the "Taliban Mafia" street gang; the gang expert testified about the hostility between the Taliban Mafia and the Case Boys gangs and that there had been a series of shooting between the two gangs: the expert also testified that Heartsman's tattoo, "8600, Funk or Die," denoted gang membership or affiliation. Thus, any error in admitting the videos was harmless.

## II. Ineffective Assistance of Counsel

Heartsman asserts counsel failed to: (1) object to hearsay evidence about statements from anonymous witnesses; (2) request a limiting instruction about the rap videotapes; (3) object to the prosecutor's peremptory challenges during jury selection; (4) withdraw as counsel after discovering he was a material witness for the defense; and (5) object to opinion testimony.

### A. Federal Authority

To prevail on a Sixth Amendment claim for ineffectiveness of counsel, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). The general rule of *Strickland*, *i.e.*, to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in applying

10

that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### B. Failure to Object to Hearsay Evidence

Heartsman argues defense counsel should have made hearsay objections to Sgt. Nowak's testimony that anonymous witnesses told him: (1) the person who shot Franklin worked at Youth Uprising and was known as "Nut Case Mike;" (2) the young man with Franklin when he was shot was known as "L. Dose" or "L. Dolge;" and (3) "L. Dose" was Harris' nickname. Nowak also testified that the resident of 2421 Ritchie Street, who was an eyewitness to the shooting, described the shooter as a "heavyset male Black." In his closing and rebuttal arguments, the prosecutor argued that Harris' description of the shooting was corroborated by these reports from anonymous witnesses. The Court of Appeal rejected the ineffective assistance claim based on failure to object to this hearsay testimony theorizing that counsel may have had a good reason for not objecting and, in any event, Heartsman had not shown prejudice. *Heartsman*, 2015 WL 2400736, at *10.

Although it would be difficult to ascribe a rational tactical reason for failing to object or at least to seek a limiting instruction relating to this testimony, the "doubly deferential" standard on habeas review precludes a finding that Heartsman was prejudiced. As noted by the Court of Appeal, the most powerful evidence against Heartsman was Harris' eyewitness testimony. Harris knew Heartsman before the killing, recognized him as the shooter, identified him by name before seeing a photographic lineup, and positively identified him in the photographic lineup. Evidence corroborated Harris' testimony that he was at the scene of the crime: (1) a few minutes after the shooting, he was on a videotape asking the police officer if he could take his bike from the crime scene; (2) his description of the shootings matched the forensic evidence; and (3) he knew Franklin's eyes and mouth remained open after he died, when no other person was allowed

close to the crime scene.  Other inculpatory evidence included:  (1) Heartsman's cell phone records showed he was at or near the scene of the crime at the time of the shooting, *see* 3 RT 491-537; ECF No. 15-2 at 32-78 (testimony of MetroPCS custodian of records); 4 RT 649-65; ECF No. 15-3 at 10-26 (testimony of police expert on cell phone calls); (2) Heartsman and Franklin were members of rival street gangs, a fact that helped explain the motive for the killing; (3) Heartsman's alibi defense was called into question by the prosecutor's cross-examination of defense witnesses; and (4) the jury heard a recorded telephone conversation made from jail by Heartsman discussing whether he should say he was at work at the time of the shooting.  Given this evidence, on habeas review the Court cannot repudiate the conclusion by the California Court of Appeals that the testimony was not prejudicial.

### C. Failure to Request Limiting Instruction for Rap Videos

Defense counsel's objection to the admission of the two rap videos was overruled by the court.  Heartsman argues his counsel should have requested an instruction limiting the videos to the question of motive so the jury would not consider them as evidence of his character. Although it would have been better if counsel had requested a limiting instruction,  a decision not to request a limiting instruction is "within the acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning evidence." *Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) (citing *United States v. Gregory*, 74 F.3d 819, 823 (7th Cir. 1996) (if attorney cannot stop the evidence from being admitted, it is rational to decide not to draw further attention to it by requesting a motion for limiting instruction).  Counsel could have decided that, once the videos were admitted, it would make little difference whether the jury considered them as evidence of motive or of Heartsman's character and that a limiting instruction would emphasize to the jury the nature of the videos.  Therefore, the failure to ask for a limiting instruction does not constitute deficient performance.


### D. Failure to Object to Prosecutor's Peremptory Challenges

Heartsman argues counsel was ineffective for failing to challenge, under *Batson v.*

*Kentucky*, 476 U.S. 79 (1986), the prosecutor's peremptory challenges of male and African-American prospective jurors.

### 1. Federal Authority

The use of peremptory challenges by either the prosecution or defendant to exclude cognizable groups from a jury may violate the Equal Protection Clause. *Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992). The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race, *see Batson v. Kentucky*, 476 U.S. 79, 89 (1986), and solely based on gender, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130-43 (1994).

Although a petitioner may not raise a *Batson* claim in a federal habeas proceeding if he failed to object to the prosecution's use of peremptory challenges at trial, *see Haney v. Adams*, 641 F.3d 1168, 1169, 1173 (9th Cir. 2011), he may raise a claim of ineffective assistance of counsel for failing to raise a *Batson* objection, *see Carrera v. Ayers*, 699 F.3d 1104, 1105 (9th Cir. 2012).

*Batson* established a three-step process for determining objections to peremptory challenges: First, the defendant must make out a *prima facie* case that the prosecutor exercised peremptory challenges on the basis of race (or gender) "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93-94. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral (or gender-neutral) explanation for striking the jurors in question. *Id.* at 97; *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98; *Wade*, 202 F.3d at 1195.

### 2. Relevant Factual Background

The prosecutor's first eight peremptory challenges were to men. ECF No. 18-2; RT Jury Voir Dire Nov. 8, 2011 at 301-02; 310; ECF No. 15-7; RT Jury Voir Dire Nov. 9, 2011 at 358-59; 383-84. The ninth challenge was to an African-American woman. *Id.* at 384. The prosecutor's first two challenges during the selection of alternate jurors were to a woman and a

man.  *Id.* at 414.  A seated juror was excused and the court reopened voir dire to fill the last seat.  *Id.* at 415-16.  The prosecutor used three peremptory challenges to excuse a man, an African-American woman and a Hispanic woman.  *Id.* at 461-63.  After the selection of alternates resumed, the prosecutor challenged three men.  *Id.* at 515-16; 528.  The final jury consisted of eight woman and four men, and the alternates included one woman and two men.  The ethnicity of the jurors consisted of eight Caucasians, two Filipinos, three Hispanics, one Japanese-American and one native of India.  *Heartsman*, 2015 WL 2400736, at *13; Ex. 5 at 58.  No jurors or alternate jurors were African-American.  *Heartsman*, 2015 WL 2400736, at *13.

### 3. Analysis

Heartsman argues counsel was deficient because, at step one of the *Batson* analysis, he could have made a *prima facie* case showing the prosecutor used his peremptory challenges on the basis of gender and race.

A party establishes a *prima facie* equal protection violation based on race by showing: (1) the defendant is a member of a cognizable racial group, (2) the group's members have been excluded from the jury, and (3) the circumstances of the case raise an inference the exclusion was based on race.  *Batson*, 476 U.S. at 96.  A defendant will satisfy the requirements of *Batson*'s first step by producing evidence sufficient for the trial judge to draw a reasonable inference that discrimination has occurred.  *Johnson v. California*, 545 U.S. 162, 170 (2005).

Even assuming Heartsman's counsel could have satisfied the first step of a *Batson* claim based on race, he could not have gotten past steps two and three.  As noted by the Court of Appeal, the prosecutor had non-racial reasons for challenging the two African-American women—one of the woman wrote on her questionnaire that her brother had been in the "penal code system" for 13 years and, in answer to a question about whether she had been arrested, accused of or convicted of a crime, she wrote, "Wet wreckless [sic] over 10 years ago."  2 CT 1234.  The second woman said that her half-sister's mother had been convicted of murder and was sentenced to life in prison, and her sister and husband lived on Ritchie Street, the street where the crime occurred.  *Heartsman*, 2015 WL 2400736, at *13.  Prosecutors commonly

excuse prospective jurors who have criminal backgrounds or who have close relatives with criminal backgrounds. *See e.g. United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir. 1987) (reasonable to challenge African-American prospective juror who had brother in prison for armed robbery), *overruled on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988); *United States v. Hendrix*, 509 F.3d 362, 370 (7th Cir. 2007) (race-neutral for prosecutor to strike prospective African-American jurors with relatives in prison; they may sympathize with defendant or feel animosity against prosecution).

In regard to gender, nothing in the case suggested women, but not men, would be biased in favor of Heartsman on the charged crimes of murder and attempted murder. In addition, that the final jury included four men suggests the prosecutor was not excluding jurors based upon gender. *See Gonzalez v. Brown*, 585 F.3d 1202, 1210 (9th Cir. 2009) (that African-American juror remained on the jury panel indicative of nonracial motive for prosecutor's challenges of other African-Americans); *Cooperwood v. Cambra*, 245 F.3d 1042, 1047-48 (9th Cir. 2001) (prosecutor's challenge to African-American male candidate did not establish *prima facie* case of discrimination where final panel had two African-American panelists, three Asian-Americans and one Pacific Islander).

Based on the foregoing, even if counsel had objected to the prosecutor's preemptions based on race or gender, the objection would have been unsuccessful. Counsel cannot be faulted for not bringing a motion or objection destined for failure. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (counsel need not file frivolous motions).

**E. Failing to Withdraw**

Heartsman argues trial counsel was required to withdraw from representing him when he became a material witness for the defense.

### 1. Federal Authority

The Sixth Amendment guarantee of assistance of counsel comprises two correlative rights: the right to counsel of reasonable competence, *McMann v. Richardson*, 397 U.S. 759, 770-71 (1970), and the right to counsel's undivided loyalty, *Wood v. Georgia*, 450 U.S. 261,

271-72 (1981). The right to conflict-free counsel is violated only if the conflict "adversely affected" trial counsel's performance. *Alberni v. McDaniel*, 458 F.3d 860, 870-71 (9th Cir. 2006) (an actual conflict is defined by its effect on counsel, not by whether there is a mere theoretical division of loyalties). To show an adverse effect, the petitioner must demonstrate that some plausible alternative defense strategy might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006). The Supreme Court has applied a presumption of prejudice only to multiple-representation cases; whether the presumption applies in other contexts is an open question. *Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005); *see e.g., Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007) (affirming denial of habeas claim alleging a violation of right to conflict-free appointed appellate counsel because no Supreme Court case has held an irreconcilable conflict between defendant and appointed appellate counsel violates Sixth Amendment).

### 2. Analysis

Heartsman claims counsel's testimony was necessary to corroborate the testimony of several alibi witnesses about when they saw and identified Heartsman on the Youth Uprising surveillance tapes and that they did not identify Heartsman at counsel's request. *See Heartsman*, 2015 WL 2400736, at *16-17 (discussing relevant facts). The Court of Appeal held Heartsman had not established an actual conflict between himself and his counsel nor had he established prejudice. *Id.* at *17. This ruling is not contrary to or an unreasonable application of Supreme Court authority because the Supreme Court has not held, if an attorney becomes a witness for a limited purpose in his client's case, the Sixth Amendment is violated. *See Foote*, 492 F.3d at 1029. Also, in light of the credibility issues brought out on cross-examination of the alibi witnesses, even if counsel had testified, there is no reasonable probability the jury's view of the witnesses' credibility would have changed.

### F. Failing to Object to Opinion Evidence

Heartsman argues trial counsel should have objected to Nowak's "improper opinion

testimony" and the prosecutor's argument based on that testimony. *See Heartsman*, 2015 WL 2400736, *10 (listing Heartsman's claims of improper testimony and improper argument).

The defense theory of the case was that the killer was Rondell Hampton, who looked like Heartsman and who drove a white Corsica, which could have been mistaken to be a white Japanese car. 1 RT 194, 197, 202 (defense opening); 6 RT 1178-82 (defense closing). Defense counsel argued that Harris had lied about being at the scene of the crime and Nowak had blindly accepted Harris' description of the murder without considering other evidence. In response, the prosecutor was entitled to present how Nowak had investigated the crime and how he came to his conclusion that Harris was being truthful. *See United States v. Young*, 470 U.S. 1, 11-12 (1985) (prosecutor's response in closing argument to defense attacks usually not prejudicial); *Darden*, 477 U.S. at 179 (prosecutor's comments to be evaluated in light of defense argument that preceded it).

Furthermore, as reasonably found by the Court of Appeal, none of the "opinion" testimony of which Heartsman complains was prejudicial in the sense that term is used on federal habeas review. As discussed previously, substantial evidence, apart from Nowak's testimony, showed that Harris was at the scene of the crime. Harris testified at the trial so the jury made its own determination about Harris' credibility. Nowak's opinion that American-made cars are bigger than Japanese cars could not outweigh the jury's own conclusion after seeing photographs of both cars. And, contrary to Heartsman's claim, counsel did object to Nowak's testimony that young men in Oakland know sports teams. *See* 6 RT 1073; ECF No. 15-5 at 83.

## III. Prosecutorial Misconduct

Heartsman asserts several instances of prosecutorial misconduct and claims his counsel was ineffective for failing to object to them. Because the Court finds no prosecutorial misconduct, counsel was not ineffective for failing to object.

### A. Federal Authority

A defendant's due process rights are violated when a prosecutor's misconduct renders a

trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). Factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, *see United States v. Young*, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182. Even if prosecutorial misconduct occurs, relief cannot be granted unless the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

**B. Analysis**

The Court of Appeal addressed the merits of Heartsman's claims even though it found they were procedurally defaulted based on failure to object during the trial. Even if the claims are not defaulted, *see Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004) (California's contemporaneous objection rule is procedural bar in federal habeas proceedings), the Court of Appeal's denial on the merits is not unreasonable.

**1. Arguing Facts not in Evidence**

**a. Colors of Baseball Cap**

Harris testified the killer's companion wore a black and red baseball cap with a "C" for the Cubs. During his closing, defense counsel noted the Cubs' colors were blue and red, not black and red, and the cap found in the white Corsica was a black and red Redwings cap. Counsel went on to say that caps of any color were readily available. The prosecutor's objection on the ground that counsel was testifying about the colors of baseball caps was sustained by the court. In his rebuttal, the prosecutor argued there were a number of different colored baseball caps but, citing Sgt. Nowak's testimony that "these kids know their sports teams," Harris would

not have mistaken a Redwings' cap for a Cubs' cap no matter what the colors were.  Heartsman argues this statement was improper because the court had upheld the prosecutor's objection to defense counsel's statement on the same topic.

The prosecutor's remark about baseball caps coming in different colors merely agreed with defense counsel's statement that hats are made in many colors and it was an isolated remark.  Therefore, it was not prejudicial.

### b. Prosecutor's Use of Examples in Closing Argument

Heartsman argues the prosecutor's use of the principle of Occam's razor, the Barry Bonds story and a story on the Oprah Winfrey show was improper because they were not introduced into evidence.  However, the prosecutor used these concepts to illustrate a point to the jury—that the alibi witnesses were "too good to be true."  *See* 6 RT 1207-08; 1238.  Evidence of these illustrations did not need to be introduced during the trial for the prosecutor to refer to them in his closing argument.

### c. Alford's Cell Phone Photo of Heartsman

Defense witness Alford testified he had on his cellphone a photograph of Heartsman wearing a letterman's jacket, similar to the jacket worn by the man in the surveillance tapes that defense witnesses identified as Heartsman.  In his closing argument, defense counsel argued that the photograph was taken before Heartsman was arrested.  Counsel continued, "At break from the jury, he emailed a picture—."  The prosecutor objected on the ground that counsel was testifying.  The court asked, "Did you present evidence of that?"  Counsel stated, "Okay. Moving on."  The court criticized counsel for discussing facts that had not been presented as evidence.

Alford did testify he had emailed the photograph to the court.  5 RT 962-63.  Heartsman argues, as a result of the prosecutor's objection, the jury would not consider the photograph.

Even if the prosecutor's objection and the trial court's decision to sustain it were improper, there was no prejudice because the jury saw the photograph, *see* 3 RT 1108, (Defense

Exhibit UU),[1] the jury heard evidence the photo showed Heartsman wearing the jacket worn by the person in the surveillance video, 5 RT 962-63, the jacket was admitted into evidence, 6 RT 1201 (Exhibit TT), and counsel argued the photo showed Heartsman wearing the same jacket as the person in the video, 6 RT 1201-02.

### 3. Phony Alibi Argument

Heartsman claims the prosecutor's argument that the alibi evidence was false constitutes misconduct.

### a. Mora's Telephone Call to Sgt. Nowak

Sgt. Nowak testified that Heartsman was arrested and brought to the police station at 12:15 p.m. on July 6, 2011, and that defense witness Mora called 25 minutes later. 6 RT 1046-48. The prosecutor asked, "Why did Mr. Mora call?" and defense counsel objected on hearsay grounds. *Id.* The prosecutor said the testimony was offered for its effect on Nowak, not for the truth. *Id.* The court told the jury the testimony was admitted only to prove Mora's statement had been made, not to prove its truth. 6 RT 1048-50. Nowak then testified he was surprised when Mora said he had a video of Heartsman at work at the time of Franklin's murder because the reason for Heartsman's arrest had not been made public. 6 RT 1051. In his closing argument, the prosecutor mentioned Mora's call was suspicious because, at the time of his call, no one had been told why Heartsman was arrested. Defense counsel objected, but the court overruled him. Heartsman now contends the prosecutor improperly argued the content of the call showed his alibi defense was false.

Mora's statements were not offered for their truth, and the prosecutor could legitimately use those statements to argue Heartsman's alibi was contrived. The fact that Mora made a call to the police station so soon after Heartsman was arrested was itself evidence that Heartsman had discussed his crime and alibi with his friends prior to his arrest.

### b. Arguing Defense Counsel Manufactured False Alibi

---

[1]Counsel identified the photograph to Alford as Exhibit HH, but it is listed in the Reporter's Transcript as UU.

Heartsman complains that the prosecutor suggested defense counsel was manufacturing a false alibi because, in the prosecutor's closing argument, he said defense counsel had not mentioned in his opening statement that Heartsman was in the surveillance video at the time of the murder. 6 RT 1219. Heartsman argues the prosecutor ignored the following two statements counsel made in his opening argument: (1) it was impossible for Heartsman to have been at the crime scene, and (2) I will show you Heartsman was not there. 1 RT 196, 203.

Because the defense does not have to lay out its entire case in its opening statement (indeed the defense does not have to give an opening statement at all), it was likely inappropriate for the prosecution to base its argument on the failure of the defense to include all its evidence in its opening. Even so, the prosecutor's statement was not prejudicial—it was a relatively inconsequential statement that could easily have been refuted by the defense in its closing argument; it did not suggest defense counsel was manufacturing a false alibi; and the court gave the standard jury instruction that attorney argument is not evidence. *See* ECF No. 15-5 at 252.

Next, Heartsman, citing 6 RT 1223-24, argues the prosecutor improperly implied defense counsel procured alibi witnesses by saying in his closing argument: "Remember, Mr. Martin (defense counsel) had Mr. Alford come down." However, the prosecutor's entire statement is: "Remember, Mr. Martin had Mr. Alford come down, brought him up to the screen so he could look at phone records," and then the prosecutor discussed Alford's testimony about the phone records. 6 RT 1223-24. Although the prosecutor mentioned defense counsel by name, this statement did not impugn counsel; instead, it was an introduction to the prosecutor's remarks about Alford's testimony regarding phone records he viewed on a screen.

Heartsman argues the prosecutor impugned his attorney by calling the man in the Youth Uprising video the "phony defendant" and calling the defense "malarkey." Heartsman cites *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005), which held it was improper for the prosecutor to argue defense counsel presented a "red herring" defense and that counsel and defendant needed to "get their stories straight." However, in *United States v. Nobari*, 574 F.3d 1065, 1079 (9th Cir. 2009), the Ninth Circuit ruled it was not misconduct for the prosecutor to

argue defense counsel was trying "to get someone on the jury to . . . take a red herring" and the defense case was "smoke and mirrors" because the comments were directed to the merits of the case and did not amount to an attack on defense counsel. *See also Williams v. Borg*, 139 F.3d 737, 744-45 (9th Cir. 1998) (no misconduct when prosecutor referred to defense closing argument as "trash").

Although the prosecutor told the jury "evidence put on by the defendant's alibis is an attempt to snooker you with malarkey," 6 RT 1210, the prosecutor's argument and rebuttal were directed at the weakness of the alibi defense itself, not at defense counsel creating a phony defense. See 6 RT 1123-51 (Closing Argument); 6 RT 1207-41 (Rebuttal).

Nor was the prosecutor's discussion of the "Hella Shit" and "Funk or Die" videos misconduct once the trial court made the decision to allow their admission. The prosecutor was permitted to discuss the evidence presented at trial.

Furthermore, it is unlikely that the prosecutor's allegedly improper statements had a substantial influence or effect on the jury's verdict. As discussed above, the prosecution's case against Heartsman was strong, and the alleged misconduct consisted of isolated incidents.

## IV. Judicial Misconduct

Heartsman argues the trial court's conduct shows it was biased against the defense.

### A. Federal Authority

The Due Process Clause guarantees a criminal defendant the right to an impartial judge. *In re Murchison*, 349 U.S. 133, 136 (1955). A trial judge "must be ever mindful of the sensitive role [the court] plays in a jury trial and avoid even the appearance of advocacy or partiality." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995). However, to succeed on a judicial bias claim, a petitioner must overcome a presumption that judges are honest and trustworthy. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if the remarks are critical, disapproving of or even hostile to counsel, the parties or their cases. *Liketky v. United States*, 510 U.S. 540, 555 (1994). It is generally appropriate for a trial judge to clarify testimony and

assist the jury in understanding the evidence. *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir. 1988). It is also generally appropriate for a trial judge to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony. *United States v. Morgan*, 376 F.3d 1002, 1008 (9th Cir. 2004). A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when the record discloses actual bias or leaves the reviewing court with an abiding impression that the judge's remarks and questioning projected to the jury an appearance of advocacy or partiality. *United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001).

A claim of judicial misconduct by a state judge in the context of federal habeas review does not simply require that the federal court determine whether the state judge committed judicial misconduct; rather, the question is whether the state judge's behavior "rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (trial judge properly posed questions to prosecution witnesses to clarify evidence even though the questions may have permitted testimony that was helpful to prosecution or detrimental to defense).

**B. Analysis**

The Court of Appeal summarized Heartsman's claims of judicial bias as follows: (1) the trial court sustained a number of prosecution objections to defense witnesses' testimony or defense attorney's argument, even disallowing defense witnesses' hearsay testimony on its own motion, but did not prevent the prosecution from eliciting hearsay testimony; (2) on occasion, the court questioned defense witnesses or clarified their answers; (3) the court admonished defense counsel when he disobeyed the court's ruling on a motion in limine; (4) the court directed defense counsel to frame his questions so that they would be understood when the transcript was read at a later date; (5) on occasion, the court asked defense counsel to end extensive or repetitious questioning; (6) on occasion, the court suggested questions defense counsel could ask, or clarified his questions; (7) the court explained the word "decedent" referred to Franklin;

(8) the court told defense counsel not to testify when questioning witnesses; (9) the court told defense counsel he had no patience for jokes when defense counsel began questioning a prosecution witness about the meaning of the word "funk" by saying, "My wife said I was funky;" and (10) the court did not prevent the prosecutor from arguing the defense had presented a false alibi and tried to trick the jury with "malarkey." *Heartsman*, 2015 WL at *20.

The Court of Appeal rejected these claims on the ground they were procedurally defaulted because defense counsel failed to object to the trial court's alleged misconduct. The Court of Appeal also rejected the claims on the merits, stating Heartsman did not "show that most of the rulings of which he now complains were erroneous. Nor has [he] shown that the court went beyond the bounds of appropriate courtroom management in clarifying counsel's questions and the witnesses' answers. And although the trial court occasionally expressed impatience in front of the jury, the record does not show that the court 'crossed the line into improper behavior.'" *Id.* at *21.

Even if the judicial misconduct claims are not procedurally defaulted, *see Paulino*, 371 F.3d at 1093 (California's contemporaneous objection rule is procedural bar in federal habeas proceedings), they fail on the merits.

Contrary to Heartsman's characterization, many instances where the court asked a defense witness a clarifying question, clarified counsel's questions, or indicated how counsel could frame a question so it could be understood when the transcript was later read were helpful to the defense because the court assisted counsel in obtaining exculpatory testimony and ensured that witnesses' testimony would be understood. *See e.g.*, 2 RT 434 (court asked counsel to clarify what he meant by "that direction" and "this direction"); 2 RT 434-39 (court assisted counsel in getting eye witness to testify that he had not been 10 to 15 feet away from the shooter, but had been approximately 42 feet away); 2 RT 465 (court assisted defense counsel in properly impeaching witness with preliminary hearing transcript). Heartsman criticizes the court for instructing counsel on how to impeach a witness with prior inconsistent statements. *See* 3 RT 483-84. However, this discussion occurred when the jury was not present, so it did not cause

prejudice; on the contrary, it was helpful to the defense because counsel was having difficulty impeaching witnesses.

Furthermore, it was within the trial court's discretion to prevent repetitious questioning by defense counsel. *See e.g.*, 2 RT 322-23 (counsel questioned firearms expert at length, repeating many of prosecutor's questions, and court stated, "I think we've covered . . . what she did and did not do. There's an expression about a dead horse."). And, the court properly admonished counsel for stating a witness was not in school for disciplinary reasons when the court had ruled the reasons the witness was not in school were inadmissible. *See* 2 RT 431-33.

Finally, the court properly overruled defense counsel's objections to the prosecutor's closing argument that the alibi defense was false. *See* 6 RT 1208-09 (in response to counsel's objection there was no evidence of a false alibi, court stated, "I think it's [prosecutor's] argument that the alibi witnesses testified falsely).

In summary, although the trial court interceded many times to admonish or aid defense counsel, Heartsman's claims of judicial misconduct do not show actual bias or create an abiding impression that the court's remarks and questioning projected to the jury an appearance of advocacy for the prosecution or partiality against Heartsman, *see Parker*, 241 F.3d at 1119, nor do they show the trial was so fundamentally unfair as to violate federal due process. *See Duckett*, 67 F.3d at 740.

## V. Cumulative Prejudice

Heartsman argues the cumulative prejudice from the alleged constitutional violations establishes that he did not receive a fair trial.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). Cumulative error is more likely to be found prejudicial when the government's case is weak. *Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002).

As discussed above, the prosecutor's case against Heartsman was strong. Furthermore, because no single constitutional error occurred, no cumulative error is possible. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).

## VI. Evidentiary Hearing

Heartsman requests an evidentiary hearing on all of his claims. This request is denied because Heartsman has not shown he is entitled to an evidentiary hearing in connection to these claims. *See Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (when state court record precludes habeas relief under § 2254(d), district court not required to hold evidentiary hearing).

## CONCLUSION

Heartsman's petition for a writ of habeas corpus is denied. A certificate of appealability will issue on the claim of judicial misconduct because reasonable jurists could find the district court's assessment debatable or wrong. *See* 28 U.S.C. § 2253(c). However, a certificate of appealability will not issue on any of the other claims because reasonable jurists would not find the district court's assessment of them debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Clerk shall enter judgment in favor of the respondent and close the file.

**IT IS SO ORDERED.**

Dated: February 14, 2018

_____
VINCE CHHABRIA
United States District Judge